SHEA & CARLYON, LTD.
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 9688
701 Bridger Avenue, Suite 850
Las Vegas, NV 89101
Telephone No. (702) 471-7432
Facsimile No.  (702) 471-7435
Email: ssherman@sheacarlyon.com

*Counsel for Secured Creditor, Wells Fargo Bank, National Association*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-09-52910-GWZ<br>Chapter 11 |
| TAHOE FRIDAY, LLC | DATE:   October 27, 2009 |
| Debtor. | TIME:   10:00 a.m. |

### MOTION FOR: (1) RELIEF FROM AUTOMATIC STAY AS TO DEBTOR'S REAL PROPERTY; (2) DETERMINATION OF DEBTOR'S STATUS AS OWNER OF SINGLE ASSET REAL ESTATE; AND (3) JUDICIAL NOTICE OF PLEADINGS FILED IN A RELATED CASE WITHIN THIS DISTRICT

Wells Fargo Bank, National Association, as successor-in-interest to Placer Sierra Bank ("Wells Fargo"), by and through its counsel, Shlomo S. Sherman, Esq. of the law firm of Shea & Carlyon, Ltd., hereby moves this Court for an order granting relief from the automatic stay to complete its foreclosure of the real property commonly known as 944 Friday Avenue and 939 LaSalle Street, South Tahoe, California 96150, and assigned Assessor Parcel Nos. 029-053-08 and 029-053-13, respectively (the "Real Property"), as well as any personal property related thereto in which Wells Fargo holds a security interest (collectively, the "Property").  In addition, Wells Fargo seeks a determination as to Debtor's status as the owner of a single asset real estate under 11 U.S.C. § 101(51(b), and requests judicial notice of the pleadings filed in the related case of In re Nationwide Equities, LLC, Case No. BK-S-09-11227-BAM (the "Nationwide Case").

1    This Motion is made pursuant to 11 USC § 362(d)(1), (d)(2), (d)(3) and (d)(4) and is

2  based upon the following points and authorities, the Declaration of Adam Fasani in support

3  hereof and filed concurrently herewith (the "Fasani Declaration"); the Declaration of Cecil M.

4  Teller III, MAI filed concurrently herewith; the pleadings, papers and records on file in this

5  case, in the Nationwide Case (defined below), and in the Pollack Case (defined below), of

6  which judicial notice is respectfully requested;[1] and any evidence and/or oral argument to be

7  presented at the time of the hearing of the Motion.  This Motion is brought without prejudice to

8  Wells Fargo's rights to seek relief from the automatic stay on grounds other than those

9  discussed herein.

10    DATED this 30th day of September, 2009.

11

12

13                                         SHEA & CARLYON, LTD.

14

15

16                                         SHLOMO S. SHERMAN, ESQ.
                                           Nevada Bar No. 009688
17                                         701 E. Bridger Avenue, Suite 850
                                           Las Vegas, NV 89101
18
19                                         *Counsel for Wells Fargo Bank, N.A.*

20

21

22

23

24

---

25  [1] Under Federal Rule of Evidence 201, "a court may take judicial notice of a fact … (2) capable of accurate and
    ready determination by resort to sources whose accuracy cannot reasonably be questioned." Thus the Ninth
26  Circuit has held that "[m]aterials from a proceeding in another tribunal are appropriate for judicial notice." Biggs
    v. Terhune, 334 F.3d 910, 916 fn. 3 (9th Cir. 2003). "[W]hen a court takes judicial notice of a matter of public
27  record, such as another court's opinion, it may not do so 'for the truth of the facts recited therein, but for the
    existence of the opinion, which is not subject to reasonable dispute over its authenticity.'"  In re Western States
28  Wholesale Natural Gas Antitrust Litigation, 2007 WL 2178063 *14 (D. Nev. 2007).

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

# TABLE OF CONTENTS

POINTS AND AUTHORITIES ..................................................................................................4

FACTUAL BACKGROUND ....................................................................................................6

    **Introduction** .....................................................................................................................6

    **The Loan History** ............................................................................................................6

    **The Nationwide Case** ....................................................................................................11

    **The Pollack Bankruptcy** ...............................................................................................12

    **Tahoe Friday, LLC** .......................................................................................................13

    **The Property and the Debt** ...........................................................................................14

LEGAL AUTHORITY ...........................................................................................................16

    **A.**    **Relief From Stay for Cause Under § 362(d)(1)** ..................................................16

        **1.**    **Bad Faith** ...............................................................................................17

        **2.**    **Debtor's Schedules Are Incorrect** .......................................................21

        **3.**    **Irregularities in Acquisition of the Property** ......................................22

        **4.**    **Lack of Cash Flow** ...............................................................................25

    **B.**    **Relief from Stay Due to a Lack of Adequate Protection** ...................................26

    **C.**    **Relief From Stay Pursuant to §362(d)(2)** ...........................................................28

        **1.**    **No Equity Exists in the Real Property** .................................................28

        **2.**    **The Property is Not Necessary to an Effective Reorganization** ..........29

    **D.**    **A Determination that the Nature of Debtor's Business is that of a Single Asset Real Estate** ........31

    **E.**    **Relief From Stay Pursuant to §362(d)(4)** ...........................................................32

**CONCLUSION** .....................................................................................................................**35**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

1

**TABLE OF AUTHORITIES**

2

3    **Cases**

4    Coco v. Ranalletta, 733 N.Y.S.2d 849 (N.Y. Sup. 2001)............................................25

5    **Duggan v. Highland-First Ave. Corp.,** 25 B.R. 955, 962 (Bankr. Cal. 1982).................21

6    In re 234-6 West 22nd St. Corp, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) ..............27

7    **In re ACI Sunbow, LLC,** 206 B.R. 213, 217 (Bankr. S.D. Cal. 1997) ............................18

8    In re Arnold, 806 F.2d 937, 939 (9th Cir.1986) ............................................................18

9    In re Bialac, 712 F.2d 426 (9th Cir. 1983) ...................................................................29

10   In re Brown, 78 B.R. 449, 503 (Bankr. S.D. Ohio 1987)..............................................29

11   In re Buchholz, 224 B.R. 13, __ (Bankr. D.N.J. 1998) ................................................25

12   In re Certified Mortgage Corp., 20 B.R. 787, 788 (Bankr. M.D. Fla. 1982).................18

13   In re Cornelius, 408 B.R. 704, __ (Bankr. S.D. Ohio. 2009) ........................................25

14   **In re Duncan & Forbes Development, Inc.,** 368 B.R. 27, 32 (Bankr. C.D. Cal. 2006).......................33, 34, 35

15   **In re Duvar Apt., Inc.,** 205 B.R. 196, 200 (9th Cir. BAP 1996) .............................19, 20

16   In Re Ellis, 60 B.R. 432, 435 (9th Cir. B.A.P. 1985) ....................................................18

17   In re Food Barn Stores, Inc., 159 B.R. 264, 266 (Bankr. W.D. Mo. 1993)..................17

18   In Re Gauvin, 24 B.R. 578 (9th Cir. B.A.P. 1982).........................................................18

19   In re H-Ren, Corp., 65 B.R. 661 (Bankr. S.D. Ohio 1986) ...........................................31

20   In re Indian Palms Assoc., Ltd., B.C., 61 F.3d 197 (3rd Cir. 1995) ..............................30

21   In re James River Assoc., 148 B.R. 790 (Bankr. E.D. Va. 1992)..............................28, 29

22   In re Jamesway Corp., 179 B.R. 33, 35 (S.D.N.Y. 1995) .............................................29

23   In re Laguna Assocs. Ltd P'ship, 30 F.3d 734, 737-38 (6th Cir. 1994) ........................18

24   In re MacInnis, 235 B.R. 255 (Bankr. S.D. N.Y. 1998) ................................................27

25   In re Martens, 331 B.R. 395, 398 (8th Cir. B.A.P. 2005)..............................................17

26   In re McPherson, 225 B.R. 203 (Bankr. D. Idaho 1998)...............................................28

27

28

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) ............................................... 29

In re Nattchase Assocs. Ltd. P'ship, 178 B.R. 409, 416 (Bankr. E.D. Va. 1994) ....................... 27

In re Pacific Rim Investments, LLP, 243 B.R. 768, 772 (D. Colo. 2000) ..................................... 18

In re Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1394 (11th Cir.1988) .......................................... 18

In re Pinto, 191 B.R. 610, 612 (Bankr. D.N.J. 1996) ................................................................... 28

In re Sun Valley Ranches, Inc., 823 F.2d 1373, 1375 (9th Cir. 1987) ........................................ 29

In Re Sun Valley Ranches, Inc., 823 F.2d 1376 (9th Cir. 1987) ................................................. 18

In re Texas State Optical, Inc., 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995) ............................. 17

In re Trident Assoc's Ltd. P'ship., 176 B.R. 16 (Bankr. E.D. Mich 1993) .................................. 19

In re Trujillo, 378 B.R. 526 (6th Cir. BAP. 2007) ...................................................................... 25

In re Tuscon Estates, Inc., 912 F.2d 1162, 1166 (9th Cir. 1990) ................................................ 17

In re Vessa, __ B.R. __, 2004 WL 2640350, 4 (10th Cir. B.A.P. 2004) ................................... 18

In re Washington Funding Corp. 13 B.R. 216, 223 (Bankr. S.D.N.Y. 1975) ............................ 29

In re Wilson, 318 Fed. Appx. 354 (6th Cir. 2009) ..................................................................... 25

Jordan v. Securities Credit Corp., 314 P.2d 967 (1957) ............................................................. 25

Matter of 183 Lorraine Street Assocs., 198 B.R. 16, 23 (E.D.N.Y. 1996) ................................ 29

Matter of Lake Tahoe Land Co., Inc., 5 B.R. 34 (Bankr. Nev. 1980) ........................................ 28

Matter of Little Creek Development Co., 779 F.2d 1068, 1072 (5th Cir.1986) .......................... 18

United Sav. Ass'n v. Timbers, 484 U.S. 365, 375-76 (1988)...............................................29, 31

United Sav. Ass'n v. Timbers, 484 U.S. at 375-76 ..................................................................... 29

**Statutes**

11 U.S.C. § 101(51B) .................................................................................................................. 32

11 USC § 362(d)..............................................................................................................2, 27, 29, 34

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

## POINTS AND AUTHORITIES

### I

### FACTUAL BACKGROUND

#### Introduction

1.      This bankruptcy case is the third in a series of bankruptcy cases subjecting the Property to the automatic stay, thereby preventing Wells Fargo from completing its foreclosure thereof.

2.      The Property is owned by a number of Tenants in Common ("TICs"), several of which have been acting in concert throughout these cases to deprive Wells Fargo of its substantive and procedural rights with respect to the Property.

3.      It is Wells Fargo's hope that, as a result of the relief granted by this Court to Wells Fargo, this will be the last bankruptcy to delay Wells Fargo's exercise of its bargained-for rights.

#### The Loan History

4.      On October 1, 29002, Placer Sierra Bank ("Placer") made a loan to A&A Tradewinds, LLC ("A&A") in the amount of $2,968,000.00 (the "Loan").  See Wells Fargo's Proof of Claim ("POC") on file herein,[2] a true and correct copy of which is attached hereto as **Exhibit "1"**.  Fasani Declaration, ¶ 3.

5.      The Loan was evidenced by a promissory note dated October 1, 2002, with loan number 3136111 (the "Note"), and was made pursuant to a Business Loan Agreement of the same date (the "Loan Agreement").  See POC, Exhibits A and B.  Fasani Declaration, ¶ 4.

6.      The Loan was secured by a first priority deed of trust on the Real Property in favor of Placer (the "Deed of Trust").  See POC, Exhibit C; Fasani Declaration, ¶ 5.

---

[2] See also the Fasani Declaration filed concurrently herewith which authenticates the exhibits to the POC.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

7.      In addition, the Loan was also secured by all of A&A's personal property pursuant both to the Deed of Trust, as well as a Commercial Security Agreement executed in favor of Placer.  See POC, Exhibit D; Fasani Declaration, ¶ 6.

8.      Placer's security interest in A&A's personal property was subsequently perfected, as evidenced by a UCC1 Financing Statement filed with the California Secretary of State on September 20, 2002, as Document No. 0226660303, and a second UCC1 Financing Statement recorded with the El Dorado County Recorder on October 22, 2002 as Document No. 2002-0080808-00.  See POC, Exhibits E and F.  Fasani Declaration, ¶ 7.

9.      In early 2003, as a result of Placer's receipt of certain debenture proceeds from EDF Resource Capital, Inc. and a corresponding reduction in the balance of the Loan, A&A and Placer executed a Modification of Deed of Trust (the "Modification") dated December 11, 2002, and recorded with the El Dorado Country Recorder on April 2, 2003 as Document No. 2003-0032127-00, modifying the Deed of Trust solely to reflect the new outstanding principal balance of $1,855,000.00.  See POC, Exhibit G.  Fasani Declaration, ¶ 8.

10.     On or about September 22, 2007, Placer merged into Wells Fargo, which succeeded to all of Placer's assets, including the Note and Placer's security interest in the Property.   A true and correct copy of the letter from the Comptroller of the Currency Administrator of National Banks confirming the merger is attached hereto as **Exhibit "2"**. Fasani Declaration, ¶ 9.

11.     Each of the Note, the Loan Agreement, the Deed of Trust, and the Commercial Security Agreement expressly provided that it would inure to the benefit of Placer's successors and assigns.  Specifically:

a.   the Note provides that "[t]he terms of this Note…shall inure to the benefit of Lender and its successors and assigns."  See Note, p. 3.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

7

b.  the Deed of Trust defines the term "Beneficiary" as "Placer Sierra Bank, and its successors and assigns." See Deed of Trust, p. 7.  It also separately provides that "this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns." Id.

c.  the Loan Agreement similarly defines "Lender" as "Placer Sierra Bank, and its successors and assigns."  See Loan Agreement, p. 7.  The Loan Agreement also separately provides that "[a]ll covenants and agreements contained by or on behalf of Borrower...shall inure to the benefit of Lender and its successors and assigns."  Id.

d.  the Commercial Security Agreement similarly defines "Lender" as "Placer Sierra Bank, and its successors and assigns."  See Commercial Security Agreement, p. 6.  The Security Agreement also separately provides that "this Agreement...shall inure to the benefit of the parties, their successors and assigns."  Id.

12.    On or about October 11, 2006, A&A transferred its interest in the Property to a group of nine (9) other individuals and entities, ostensibly as tenants-in-common (the "TICs"). A copy of the Grant Deed effecting the transfer is attached hereto as **Exhibit "3"**.  Fasani Declaration, ¶ 10.

13.    The Deed of Trust includes a "Due on Sale" clause, which entitled Wells Fargo "to declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior consent, of all or any part of the Real Property, or any interest in the Real Property." See Deed of Trust, p.2. Fasani Declaration, ¶ 13.

14.    Obviously, the prejudice to Wells Fargo by transferring the Property to multiple parties as tenants in common is far greater than had the Property been transferred to a single assignee.  Indeed, as demonstrated by and throughout the three separate bankruptcy filings, Wells Fargo's bargained-for rights have been severely and adversely impacted as it has had to

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

chase its collateral in so many different venues.

15.     Wells Fargo did not become aware that A&A had transferred the Real Property until early July of 2008.  At that time, Wells Fargo learned that the Property was being managed by Nationwide Equities ("Nationwide"), the debtor in the subsequently-filed Nationwide Case.  Fasani Declaration, ¶ 12, 14.

16.     On July 23, 2009, Wells Fargo sent a letter to Nationwide, to the care of its principal, Mr. Clifford Strand ("Cliff Strand"), advising that the Loan was in default due both to the unauthorized transfer of the Property as well as to A&A's failure to make the monthly payments due for both July and August, 2008.  The letter advised that Wells Fargo did not consent to an assumption of the Loan.  Fasani Declaration, ¶ 14.

17.     On August 7, 2008, Wells Fargo also sent a letter to A&A advising that the Loan was in default due both to the unauthorized transfer of the Real Property as well as to A&A's failure to make the monthly payments due for both July and August, 2008.  The letter further advised that Wells Fargo was exercising its right to accelerate the balance of the Loan, and made demand upon A&A to pay the balance due under the Loan.  Finally, the letter advised that if A&A failed to pay the balance due under the Loan, Wells Fargo intended to exercise its rights under the loan documents, including proceeding with the foreclosure of the Real Property.   Fasani Declaration, ¶ 15.

18.     Over the course of the next months, Wells Fargo attempted to arrive at some kind of an agreement with Cliff Strand, who appeared to be speaking on behalf of the TICs.  However, notwithstanding multiple assurances by Cliff Strand that a refinance of Wells Fargo's Loan was imminent, it became clear to Wells Fargo that Cliff Strand's promises were illusory, at best.  Wells Fargo also became suspicious of Cliff Strand's intentions when he refused to provide the individual contact information for each of the TICs in connection with a

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

9

proposed forbearance agreement, instead advising that Nationwide's address should be used for all of them.  Nationwide itself was not a TIC at the time; nor did it ever present any power of attorney or other authority to act or to receive notices on behalf of the TICs.  The details of Cliff Strand's failed promises and assurances are set forth in the <u>Fasani Declaration</u>, ¶¶ 16-21, 24-26, 30.

19.    A&A failed to pay the balance due under the Loan, and the TICs failed to refinance the Loan or to otherwise reach a suitable forbearance agreement with Wells Fargo.  Thus, on October 8, 2008, Wells Fargo caused a Notice of Default to be recorded with El Dorado County Recorder as Document No. 08-0049259.  A true and correct copy of the Notice of Default is attached to the POC as Exhibit I.  <u>Fasani Declaration</u>, ¶ 22.

20.    Wells Fargo's foreclosure was scheduled for February 4, 2009.  <u>Fasani Declaration</u>, ¶ 23.

21.    In mid-January, 2009, Wells Fargo was contacted by Robert Atkinson, counsel for Nationwide.  He advised, quite openly, that he had been engaged by Cliff Strand to explore ways to stall the trustee's sale.  To this end, Mr. Atkinson stated his "belief" that there was a defect in the service of Wells Fargo's Notice of Default, but that "they" would be willing to "waive their claims" if Wells Fargo extended the trustee's sale date.  <u>Fasani Declaration</u>, ¶ 27.

22.    Wells Fargo was also concerned by the inconsistency between Mr. Atkinson's initial representation that he had been engaged by Nationwide and Cliff Strand, and his subsequent proposal to waive claims regarding notice, as: (a) Nationwide was not believed to be an owner of the Property at the time; (b) it was not Wells Fargo's impression that it would be Nationwide that would be asserting that service of the Notice of Default was defective; and (c) Nationwide's interest were in direct conflict with those of the TICs in many respects.  <u>Fasani Declaration</u>, ¶ 28.

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

10

23.     On or about January 23, 2009, Cliff Strand transferred his 4.17% undivided interest in the Property to Nationwide.   A copy of the Grant Deed effecting the transfer is attached hereto as **Exhibit "4"**.

### The Nationwide Case

24.     On January 29, 2009, Cliff Strand caused Nationwide to file for protection under Chapter 11 of the Bankruptcy Code.  Fasani Declaration, ¶ 31.

25.     Throughout the Nationwide Case, Nationwide offered more of the same, including a presentation of no less than three successive "imminent" deals, each of which contradicted the former, and included no supporting documentation.  Nationwide did not seek the Court's approval for any of these deals.  Fasani Declaration, ¶¶ 33, 35-39.

26.     Nationwide also unabashedly announced that it had no intent of filing a plan of reorganization.

27.     On or about April 30, 2009, Wells Fargo filed its motion for relief from the automatic stay, seeking relief under 11 U.S.C. § 362(d)(1), (d)(2), (d)(3) and (d)(4).  See Nationwide Case, Docket No. 47; Fasani Declaration, ¶ 34.

28.     The court ultimately granted Wells Fargo relief from stay under 11 U.S.C § 362(d)(2), finding that: (a) Nationwide was without equity in the Property, and (b) that the Property was not necessary to an effective reorganization (Nationwide having failed to file a feasible plan of reorganization by the deadline established by the court in which to file it).  See Nationwide Case, Docket No. 96.  Fasani Declaration, ¶ 40.

29.     The order granting Wells Fargo relief from stay, entered on June 30, 2009, also expressly found that, "Wells Fargo's evidence of standing and its status as a real party in interest is accepted as sufficient."   A copy of the court's order is attached hereto as **Exhibit "5"**.  Fasani Declaration, ¶ 41.

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

11

30.     Wells Fargo had also sought relief from stay pursuant to 11 U.S.C. § 362(d)(4), contending that the filing of the petition "was part of a scheme to delay, hinder and defraud creditors that involved either – (A) transfer of all or part ownership of, or other interest in, such real property without consent of the secured creditor….or (B) multiple bankruptcy filings affecting such real property."

31.     While the court ultimately did not grant Wells Fargo relief from stay on this basis, Wells Fargo presented a scheme to delay hinder and defraud Nationwide's creditors perpetrated by Mr. Strand, and advised the court of its fear that, given the TIC ownership structure, multiple bankruptcy filings involving the Property would likely follow if Wells Fargo was not granted *in rem* relief from stay under 11 U.S.C. § 362(d)(4).

**The Pollack Bankruptcy**

32.     On March 2, 2009, while the Nationwide Case was pending, another TIC – Alan Pollack – also filed bankruptcy in the Central District of California (the "Pollack Case"). Fasani Declaration, ¶ 49.

33.     Almost immediately after Wells Fargo received relief from stay in the Nationwide Case, armed with an express finding that Wells Fargo was the real party in interest with respect to the Property, Cliff Strand and his cohorts contacted the bankruptcy court in the Pollack case, the trustee under the Deed of Trust, and the trustee's agent, insisting that Wells Fargo did not have standing to seek the foreclosure of the Property.  The details of these attempts are set forth in the Fasani Declaration, at ¶¶ 42 through 51.

34.     Perhaps the most prominent – and ironic – of these attempts, was reflected in Cliff Strand's opposition to the motion to lift stay that Wells Fargo filed in the Pollack case. Though Cliff Strand himself, who was no longer an owner of the Property, was without

standing to appear in that case,[3] he nevertheless opposed Wells Fargo's motion, challenging Wells Fargo's standing to seek relief from stay.  A similar opposition was filed by Mr. Michael Strand.  Fasani Declaration, ¶ 50-51.

35.     Notwithstanding the Strand oppositions, on August 26, 2009, the date set for Wells Fargo's continued foreclosure sale, the court in the Pollack Case entered an order granting Wells Fargo's motion for relief from stay pursuant to 11 U.S.C. § 362(d)(1) and (d)(2), finding that Alan Pollack had no equity in the Property.  A copy of the court's order is attached hereto as **Exhibit "6"**.  Fasani Declaration, ¶ 52, 54.

**Tahoe Friday, LLC**

36.     Finally, on August 21, 2009, Tahoe Friday, LLC, the debtor in this case, was formed with the Nevada Secretary of State.  A few days later, several of the remaining TICs (the "Transferor TICs") transferred their interest in the Property to the Debtor, and then on August 26, 2009 – the same day that the order was entered in the Pollack Case granting Wells Fargo relief from stay – the Debtor was placed into bankruptcy.  A copy of the letter sent to WT by Debtor's counsel advising of the bankruptcy and attaching the instruments executed by the Transferring TICs is attached hereto as **Exhibit "7"**.[4]  Fasani Declaration, ¶ 55-56.

37.     Debtor has, almost immediately, picked up where Cliff Strand has left off.[5]  No more than two weeks after the filing, Debtor filed an ex parte application seeking to take the examination of Wells Fargo, the trustee under the Deed of Trust, and the trustee's agent (the "Application").     The Application makes the familiar though tired argument that Wells Fargo

---

[3] Significantly, Mr. Pollack himself did not oppose Wells Fargo's motion for relief from stay.

[4] As discussed below, there are serious questions with respect to the effectiveness of certain of these instruments that call into question what percentage interest Debtor owns in the Property.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

13

is not the real party in interest with respect to the Deed of Trust, and that there may have been a defect in the service of the Notice of Default.  Both arguments are disingenuous, as both have already been previously determined to be without any legal or factual merit.

**The Property and the Debt**

38.    As of the Petition Date, Wells Fargo was owed a total of **$1,858,480.08** on the Loan, consisting of principal in the amount of $1,688,408.03, accrued interest in the amount of $130,143.52, late fees in the amount of $7,852.92, attorneys' fees and costs in the amount of $21,166.27, and foreclosure fees in the amount of $10,909.34.  Fasani Declaration, ¶ 57.

39.    Post-petition interest on the Loan continues to accrue at the rate of $281.40134.63 (6%) per diem, and post-petition attorneys' fees and costs continue to accrue. Fasani Declaration, ¶ 58.

40.    Debtor has also apparently failed to pay the property taxes due to both El Dorado County and the City of South Lake Tahoe, although Debtor's schedules do not appear to comport with the facts.  Debtor schedules the priority claim of El Dorado County as a claim for $40,000.00.  See Docket No. 1, Schedule E.  However, on May 8, 2009, the El Dorado County Tax Collector filed a proof of claim in the Nationwide Case in the amount of $120,304.91.[6]  Similarly, Debtor schedules, as a secured claim, a tax lien owed to the City of South Lake Tahoe in the amount of $5,000.  Id., Schedule D.  However, the City of South Lake Tahoe filed a proof of claim in the Nationwide Case in the amount of $67,290.82.  No plan has been filed in the Nationwide Case, and no trustee has been appointed.  Accordingly, it is

---

[5] Indeed, as discussed below, Cliff Strand sent an e-mail to Michael Starnd and Robert Atkinson on July 21, 2009, warning that "we have until the 26th of August to figure out a solution."  That "solution" appears to have been Debtor's bankruptcy filing.

[6] According to the Appraisal, the "Amount Necessary to Redeem" the Property from El Dorado County is $80,144.90.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

14

unlikely that either of these claims have been paid.

41.    Wells Fargo had previously commissioned the preparation of two consecutive appraisals by David Graves, which valued the Property at $1.9 million and $1.7 million, respectively (the "Graves Appraisals").  At the hearing on Wells Fargo's motion for relief from stay on June 22, 2009 in the Nationwide Case, however, the court credited Mr. Strand's testimony as the principal of one of the Property's owner, which challenged many features of the Graves Appraisals.  Fasani Declaration, ¶ 59.

42.    Consequently, Wells Fargo commissioned the preparation of an appraisal report by a new appraiser, as of August 19, 2009 (the "Appraisal"), in which the appraiser concludes that the "as is" value of the Real Property and the related personal property is no more than $2,720,000.  A true and correct copy of the Appraisal is attached hereto as **Exhibit "8"**. Fasani Declaration, ¶ 60.

43.    Thus, while the encumbrances on the Property, including those that are equal or senior to Wells Fargo's security interest, thus exceeds $2 million, the Property possesses a value of no more than $$2,720,000.[7]

44.    Debtor has not offered any adequate protection to Wells Fargo.    Fasani Declaration, ¶ 63.

45.    As the impact of the declining real estate market on the Real Property's current value continues, and interest and costs continue to accrue, the already-slim equity cushion in

---

[7] This value is obviously significantly lower than that adopted by Debtor in its schedules, which is the same valuation of the Property previously asserted by Nationwide – a staggering value of $10,675,000.  This itself is disturbing as: (i) there have now been two separate bankruptcy courts in two different districts that have firmly rejected that value, and have in fact held that the Property is wholly without equity; (ii) the would-be purchasers of Wells Fargo's $1.8 million Note have consistently refused to purchase it at its face value, but have insisted on a discount; and (iii) as discussed below, the amount of the unsecured claims scheduled for the Transferor TICs in proportion to their respective interests in the Property simply does not support such a valuation.  See Fasani Declaration, ¶¶ 45-48, 61-62.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

15

1    the Real Property continues to erode, leaving Wells Fargo with little protection.

2         46.    Accordingly, and for the reasons discussed further below, Wells Fargo seeks an

3    order of this Court terminating the stay as to the Property, thereby permitting Wells Fargo to

4    conclude its foreclosure of its Deed of Trust.

5                                              **II.**

6                                      **LEGAL AUTHORITY**

7

8    A.    **Relief From Stay for Cause Under § 362(d)(1)**

9         Section §362(d)(1) requires relief from the automatic stay for "cause."  "A bankruptcy

10   court 'shall' lift the automatic stay 'for cause'."  <u>In re Tuscon Estates, Inc.,</u> 912 F.2d 1162,

11   1166 (9th Cir. 1990).  "'Cause' is an intentionally broad and flexible concept that permits the

12   Bankruptcy Court, as a court of equity, to respond to inherently fact-sensitive situations." <u>In re</u>

13   <u>Texas State Optical, Inc.,</u> 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995).  "'Cause' has been

14   defined to mean 'any reason whereby a creditor is receiving less than his bargain from a debtor

15   and is without a remedy because of the bankruptcy proceeding.'" <u>In re Martens</u>, 331 B.R. 395,

16   398 (8th Cir. B.A.P. 2005), <u>citing</u> <u>In re Food Barn Stores, Inc.,</u> 159 B.R. 264, 266 (Bankr.

17   W.D. Mo. 1993).

18        In considering a request for relief from the automatic stay for cause, the debtor has both

19   the burden of going forward with the evidence as well as the burden of ultimate persuasion.  <u>In</u>

20

21   <u>re Certified Mortgage Corp.,</u> 20 B.R. 787, 788 (Bankr. M.D. Fla. 1982).  Further, the burden to

22   prove the absence of cause is upon the debtor.  <u>See</u> <u>In Re Ellis</u>, 60 B.R. 432, 435 (9th Cir.

23   B.A.P. 1985), <u>citing</u> <u>In Re Gauvin</u>, 24 B.R. 578 (9th Cir. B.A.P. 1982).  <u>See also</u> <u>In Re Sun</u>

24   <u>Valley Ranches, Inc.,</u> 823 F.2d 1376 (9th Cir. 1987).

25        In the present case, there is sufficient cause for the lifting of the automatic stay.

26

27

28

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

16

### 1.  Bad Faith

> "'Cause' for modifying or terminating the automatic stay has…been found to
> exist when a case is filed in bad faith.  Bad faith and, thus, 'cause' may exist
> when a debtor has acted improperly in some way toward the movant creditor
> during the prepetition period and when a petition is filed to thwart foreclosure
> efforts."

In re Vessa, __ B.R. __, 2004 WL 2640350, 4 (10th Cir. B.A.P. 2004), citing In re Laguna

Assocs. Ltd P'ship, 30 F.3d 734, 737-38 (6th Cir. 1994) ("cause" to terminate stay exists

where case was filed in bad faith).  See also In re ACI Sunbow, LLC, 206 B.R. 213, 217

(Bankr. S.D. Cal. 1997) ("[i]t is too well established to require further iteration that the absence

of good faith, though not expressly set out in either § 362 or § 1112, is a basis for granting

relief from stay or dismissal"), citing In re Arnold, 806 F.2d 937, 939 (9th Cir.1986), Matter of

Little Creek Development Co., 779 F.2d 1068, 1072 (5th Cir.1986), and In re Phoenix

Piccadilly, Ltd., 849 F.2d 1393, 1394 (11th Cir.1988); In re Pacific Rim Investments, LLP, 243

B.R. 768, 772 (D. Colo. 2000) ("cause" to terminate stay existed where debtor filed Chapter 11

case to avoid state court foreclosure litigation).

Thus, a filing which coincides with the foreclosure sale, as in this case, is a factor

tending to indicate that the petition is filed solely for the purpose of delay and should be

dismissed for cause.  See In re Trident Assoc's Ltd. P'ship., 176 B.R. 16 (Bankr. E.D. Mich

1993), aff'd, 52 F.3d 127 (6th Cir. 1995), cert. denied, 516 U.S. 869 (1995).

As the Ninth Circuit Bankruptcy Appellate Panel stated in In re Duvar Apt., Inc., 205

B.R. 196, 200 (9th Cir. BAP 1996):

> The term "new debtor syndrome" identifies a pattern of conduct which
> exemplifies bad faith cases. Laguna, 30 F.3d at 738 (citing In re Little Creek
> Dev. Co., 779 F.2d 1068, 1073 (5th Cir. 1986)). Indicia of the new debtor
> syndrome include: (1) transfer of distressed property into a newly created
> corporation; (2) transfer occurring within a close proximity to the bankruptcy
> filing; (3) transfer for no consideration; (4) the debtor has no assets other than
> the recently transferred property; (5) the debtor has no or minimal unsecured

debt; (6) the debtor has no employees and no ongoing business; and (7) the debtor has no means, other than the transferred property, to service the debt on the property. In re Yukon Enter., Inc., 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984).

This case, as discussed above, is *precisely* the "new debtor syndrome" described in Duvar, and includes each and every one of the indicia of bad faith set forth therein:

1.    The interests in the Property were transferred into Debtor a *single business day* after it was formed[8] -- indeed, this is the *second* eve-of-foreclosure filing with respect to this Property.

2.    This bankruptcy case was filed *on the same day* as the entry of the order in the Pollack Case terminating the automatic stay as to the Property and permitting Wells Fargo to complete its foreclosure.

3.    *Each* of the instruments purporting to transfer the Transferring TICs' interests in the Property expressly provide that "there is no consideration for this transfer."

4.    Debtor has no assets other than its interest in the Property (other than a dubious reference to the TIC Agreement that has yet to be assumed or rejected by Nationwide in the Nationwide Case).

5.    Debtor's unsecured debt is insignificant, consisting of: (a) the unsecured "claim" or equity interests of the Transferring TICs; (b) the other TICs, presumably as co-owners, for unscheduled amounts; (c) Debtor's landlord; and (d) an unsecured debt arising out of the purchase of furniture – although, *the very same unsecured claim* was scheduled by Nationwide in the Nationwide Case, suggesting that it is, in fact, *not* an unsecured claim against *this* Debtor.

---

[8] Debtor was formed on Friday. August 21, and several of the instruments purporting to transfer TIC interests in the Property to Debtor were executed the following Monday, August 24.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

18

6.      Debtor has no employees and no ongoing business.

7.      Obviously, Debtor has no means other than the Property to satisfy Wells Fargo's secured claim.

Moreover, unlike <u>Duvar</u>, this is the second time that Wells Fargo has been stalled by the "new debtor syndrome", having already been the through the same process in the Nationwide Case!

> A creditor can establish a prima facie case of bad faith filing by showing the transfer of distressed property to the debtor within close proximity to the bankruptcy filing. <u>Id.</u>  Once a prima facie case is established, the burden shifts to the debtor to demonstrate a good faith business reason for the transfer and the filing. <u>In re Eighty South Lake, Inc.</u>, 63 B.R. 501, 508 (Bankr. C.D. Cal. 1986), <u>aff'd</u>, 81 B.R. 580 (9th Cir. BAP 1987). "If, in addition to the prima facie showing of bad faith, the creditor proves that its substantive or procedural rights have been adversely affected by the transfer and filing, 'cause' is established pursuant to 11 U.S.C. § 362(d)(1) and the Court must lift the stay."

<u>Duvar</u>, 205 B.R. at 200.  The above factors are more than sufficient to establish a prima facie case of bad faith, shifting the burden to Debtor to demonstrate its good faith.  In this case, however, in addition to satisfying the its prima facie case of bad faith, Wells Fargo has also demonstrated that "its substantive or procedural rights have been adversely affected by the transfer and filing."

In <u>Duggan v. Highland-First Ave. Corp.</u>, 25 B.R. 955, 962 (Bankr. Cal. 1982), the court held that:

> Resort to bankruptcy process to attack the substantive and procedural rights of the senior lien holders through use of the "new debtor syndrome" has never been evidenced more clearly. The sole objective of Garrett, Gertz, Van Arsdell and NewDelman was to hinder and delay the senior lien holders in enforcing their rights to proceed against the collateral. [The Debtor] is indeed an "asset-culled entity". Its petition was filed solely for the purpose of thwarting and frustrating the senior lien holders. The delay accomplished thereby must be deemed to be "malicious", "frivolous", and "unwarranted".

The court's description of the "new debtor syndrome" in <u>Duggan</u> is precisely what the

Transferring TICs, who in all likelihood have been guided by the ever-present hand of Mr. Clifford Strand, have tried to accomplish in the present case. Even if the TICs were acting in good faith – which they decidedly are not – Wells Fargo at no point bargained for security that was owned by 9 separate owners as tenants in common. A&A Tradewinds transferred the Property to multiple TICs without Wells Fargo's prior consent. Wells Fargo is now being forced to litigate in its *third* bankruptcy forum in order to exercise the rights that it bargained for under its Deed of Trust. There is absolutely no question but that, as with the Nationwide Case, the sole objective of Debtor's urgent formation, receipt of its interest in the Property, and its bankruptcy filing was to hinder and delay Wells Fargo. It is also apparent that Debtor is an asset-culled entity – as was Nationwide in the Nationwide Case; none of the individual TICS (other than Alan Pollack) are willing to file bankruptcy and to submit their other assets to this Court's jurisdiction, seeking, rather, to isolate the Property. Wells Fargo's substantive and procedural rights have been adversely affected, and Wells Fargo is therefore entitled to a finding that Debtor's bankruptcy filing was in bad faith.

Additional concerns are raised by Debtor's choice of venue. Debtor was formed in Nevada, quite evidently for the purpose of immediately filing bankruptcy here, notwithstanding that: (i) the Property is located in California; and (ii) the Transferring TICs purporting to hold the largest interests in the Property – Pureland Ventures, LLC, Snappy Mart, Inc., and Friday Avenue Copeland, LLC – are located in Wyoming, New Mexico, and California, respectively; indeed, only Matterhorn Enterprises, LLC, representing the smallest interest of the Transferring TICs, is located in Nevada. Debtor's choice of venue thus warrants

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

1    further scrutiny.[9]

2         The cast of characters in this bankruptcy is also concerning to Wells Fargo.  Aaron Reis

3    and David Copeland, both of whom purport to be principals of the Debtor, are also managing

4    members of Blue Lake Holdings, LLC – the company controlled by Cliff Strand, which has

5    been executing agreements relating to the Property for its own benefit since the beginning of

6    2008.  See Fasani Declaration, ¶ 39.  Wells Fargo sees in the involvement of these individuals

7    in this bankruptcy the ever-present guiding hand of Cliff Strand; at a minimum, their

8    involvement raises substantial conflicts of issues between themselves and the other principals

9    of Debtor.  Indeed, in an e-mail sent on July 21, 2009 by Cliff Strand to Michael Strand, which

10   Cliff Strand attached as an exhibit to his opposition to Wells Fargo motion for relief from stay

11   in the Pollack Case, he states advises that the trustee's sale was postponed to August 26, 2009,

12   and adds "[s]o we have until the 26th of August to figure out a solution."  A copy of Cliff

13   Strand's e-mail is attached hereto as **Exhibit "9"**.  That "solution" appears to have been

14   Debtor's bankruptcy filing.

15

16            **2.  Debtor's Schedules Are Incorrect**

17        Apart from the highly questionable value that Debtor attributes to the Property, as

18   discussed above, Debtor also schedules an estimated $1.5 million right to the "income, interest

19   income and 50% sale proceeds realized from sale Schedule A real property" pursuant to a

20   "Tenant in Common (TIC) agreement."  See Schedule B, Item 19.  This is odd, as Nationwide

---

[9] This is particularly so in light of that fact that Debtor was quite evidently formed for the purpose of filing bankruptcy.  In the Nationwide Case, filed in the unofficial southern district of Las Vegas, Nevada, the court issued an order to show cause as to why venue should not be transferred to California, where the Property is located.  Nationwide represented to the court (see Nationwide Case, Docket No. 25) that its preference for Nevada was due exclusively to the fact that Nationwide "and certain other TIC investors" were familiar with the Kupperlin Law Group in Las Vegas, Nevada, and that it was the choice of counsel that determined Nationwide's choice of venue.  Yet, the same "TIC investors" have once again filed bankruptcy Nevada, this time using different counsel.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

claims the very same asset in the Nationwide Case. Indeed, in the Tenants-in-Common Agreement, a copy of which is attached hereto as **Exhibit "10"**, Nationwide is identified in § 5.3 as the party entitled to 50% of the net sale proceeds generated by the Property. Nationwide listed the Tenants-in-Common Agreement on its schedule of executory contracts, and to date, has neither assumed nor rejected this contract (indeed, Debtor's own schedule of executory contracts lists Nationwide as the manager of the Property). It is therefore difficult to conceive of how Debtor, which was formed in a hurry on August 21, 2009, has acquired this purported $1.5 million asset.[10]

In its Schedule B, Debtor lists as an asset $50,000 in FF&E, located at the Real Property. However, this asset was not scheduled in the Nationwide Case. Alternatively, in the Balance Sheet filed by Nationwide (Docket No. 13), Nationwide reports FF&E in excess of $130,000 as of December 2008. It is unclear how, though the value of the Real Property has remained the same, the FF&E has depreciated by more than 60%.

In short, the information contained within Debtor's schedules is highly questionable, and furnishes further cause warranting relief from stay under 11 U.S.C. §362(d)(1).

### 3.  Irregularities in Acquisition of the Property

True to the flavor of these serial bankruptcy cases, there were several irregularities in connection with the Debtor's creation, acquisition of assets, and bankruptcy filing, which raise questions as to the nature and extent of Debtor's ownership in the Property:

(a)        The Nevada Secretary of State lists no officers for the Debtor, although the

---

[10] It is also difficult to reconcile Debtor's $1.5 million estimation of this asset with the value of the Property asserted by Debtor. Assuming that the Property is sold for its alleged value of $10,675,000, and all scheduled claims (including secured, unsecured and equity claims), totaling $5,261,381.40 are paid in full, there will remain approximately $5.4 million in net sale proceeds. If Debtor has a contractual right to 50% of the net sale proceeds, the value of that right would be closer to $2.7 million – not a meager $1.5 million.

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

22

1    petition was signed by Linda Mueller as the president of Encore EMS, Inc., the purported

2    manager of the Debtor;

3            (b)      The transfer from Matterhorn Enterprises, LLC is improperly executed by

4    Linda Mueller in her personal capacity, notwithstanding that Matterhorn Enterprises' manager

5    is Encore EMS, Inc.  A related issue is created by the notary's failure to use the form of

6    acknowledgment required under §§ 240.1655 and 240.1665 of the Nevada Revised Statutes for

7    one executing a document in a representative capacity.[11]

8

9            (c)      There *is* no New Mexico corporation by the name of "Snappy Mart, Inc.";

10   rather, the corporation that likely intended to transfer its interest in the Property to Debtor was

11   "Snappy Mart *Stores*, Inc."  The effectiveness of the transfer given the incorrect name of the

12   transferor in the grant deed is questionable.[12]

13

14           (d)      The Assignment of Limited Liability Interest executed by the members of

15   Friday Avenue Copeland, LLC does precisely what it says it does: it assigns the equity in

16

17   [11] This irregularity is actually fatal to the effectiveness of the instrument, as § 111.240 of the Nevada Revised
18   Statutes provides that "[e]very conveyance in writing whereby any real property is conveyed or may be affected
     must be acknowledged or proved and certified in the manner provided in this chapter and in NRS 240.161 to
19   240.169, inclusive."  See also Jordan v. Securities Credit Corp., 314 P.2d 967 (1957) (mortgage was not entitled
     to be recorded under Idaho law where notary executed certificate of acknowledgment in individual form when
20   person acknowledging execution of the underlying instrument was acting for a corporation in a representative
     capacity); In re Wilson, 318 Fed. Appx. 354 (6th Cir. 2009) (because notary statement for mortgage was defective
21   under Kentucky law, mortgage did not provide constructive notice to subsequent purchasers or creditors, and thus
     was subject to avoidance by Chapter 13 trustee); In re Trujillo, 378 B.R. 526 (6th Cir. BAP. 2007) (under
22   Kentucky law, recorded but defectively acknowledged mortgages do not operate to provide constructive notice of
     mortgagee's interest; In re Buchholz, 224 B.R. 13, __ (Bankr. D.N.J. 1998) (under New Jersey law, mortgage
23   which has been inadvertently recorded with defective acknowledgment does not serve as notice to subsequent
     purchaser or encumbrancer, and does not provide constructive notice of security interest); In re Cornelius, 408
24   B.R. 704, __ (Bankr. S.D. Ohio. 2009) (mortgage that was not properly acknowledged by debtor-mortgagor in
     accordance with requirements of Ohio law, and that was not entitled to be recorded as not substantially complying
25   with statutory requirements, did not provide constructive notice of mortgagor's interest in property, and was
     avoidable by Chapter 7 trustee in exercise of strong-arm powers as hypothetical bona fide purchaser, without
26   regard to any actual knowledge of mortgage that trustee possessed).

     [12] See, e.g., Coco v. Ranalletta, 733 N.Y.S.2d 849 (N.Y. Sup. 2001) (senior mortgage containing misspelling of
27   mortgagor's name did not provide junior mortgagee with constructive notice of superior lien, and thus junior
     mortgagee's correctly indexed mortgage was a superior lien, as incorrect indexing placed recording of senior
28   mortgage outside chain of title).

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

Friday Avenue Copeland, LLC to Debtor – not an interest in Property. Thus, Debtor must reduce its scheduled interest in the Property by the 20% that is still owned by Friday Avenue Copeland, LLC, and add as a separate and distinct asset its ownership of Friday Avenue Copeland, LLC.

(e) There is no record of Douglas Neary ever transferring his interest in the Property to Friday Avenue Copeland, LLC. Thus, it is more likely than not that Friday Avenue Copeland, LLC itself owns no more than a 10% interest in the Property.

(f) Each of the transferring instruments provides that "there is no consideration for this transfer." However, it appears from Debtor's schedules that each Transferring TIC received a member interest in Debtor in proportion to their contributed interest in the Property.

(g) Significantly, the relationship between the percentage interest transferred to the Debtor by each TIC and the amount of that TIC's corresponding unsecured claim, as demonstrated by the chart below, suggests that the value of the Property is $1,200,000[13] – significantly less than the scheduled value of $10,675,000.

| Transferor TIC | % Interest | Scheduled Claim |
|---|---|---|
| Snappy Mart, Inc. | 15.00% | $300,000[14] |
| Pureland Ventures, LLC | 16.67% | $200,000 |
| Matterhorn Enterprises, LLC | 8.33% | $100,000 |
| Friday Avenue Copeland, LLC/ David and Lori Copeland | 10.00% | $120,000 |
| Douglas W. Neary | 10.00% | $120,000 |
| **TOTAL** | **60.00%** | **$840,000.00** |

(h) There is no recorded instrument reflecting the transfer of Aaron Reis' interest in

---

[13] As discussed in the following footnote, Snappy Mart's scheduled claim may suggest a slightly higher value. However, as reflected in the chart, the relationship between the total amount of claims scheduled on account of the TICs and the percentage interest transferred to Debtor suggests a property value of no more than $1,400,000.

[14] Snappy Mart is the only TIC whose scheduled claim appears to exceed the value of its interest as suggested by the claims of the other TICs. Assuming that the $300,000 unsecured claim is entirely attributable to the transfer of its 15% interest, this amount suggests a total property value of no more than $2,000,000.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

the Property to Debtor (as evidenced by the letter from Debtor's counsel advising of the bankruptcy, and by the fact that Mr. Reis' scheduled unsecured claim is not liquidated), notwithstanding that Mr. Reis is listed in Debtor's statement of financial affairs as having contributed a 4.17% interest in the Property.

(i)    Finally, with respect to Matterhorn Enterprises, LLC, Pureland Ventures, LLC and Snappy Mart, Inc., the transfer of their respective interests may well have resulted in a breach of contract.  As discussed in greater detail below – as well as in the Fasani Declaration, ¶ 39 – in the Nationwide Case, Nationwide presented the Declaration of Brenda Burnett of Coast to Coast Escrow (see Nationwide Case, Docket No. 74), who testified as to an executed purchase agreement and escrow instructions by a majority of the TICs.  Nationwide also attached a copy of a Commercial Property Purchase Agreement and Escrow Instructions (see Nationwide Case, Docket No. 82, Exhibit 2), which was executed by, *inter alia*, Matterhorn Enterprises, LLC, Pureland Ventures, LLC and Snappy Mart, Inc., and promises to convey their respective interests in the Property to Blue Lake Holdings, LLC (controlled by Mr. Strand).  During Mr. Strand's testimony in the Nationwide Case, he testified that he regarded this purchase agreement (which did not include a closing date) as still valid.  Thus, Matterhorn Enterprises, LLC, Pureland Ventures, LLC and Snappy Mart, Inc. have transferred interests in property to the Debtor that they are apparently already contractually obligated to transfer to Blue Lake Holdings, LLC.

Given the questions surrounding Debtor's ownership of the Property, cause exists to lift the automatic stay.

### 4.  Lack of Cash Flow

Finally, lack of funds or cash flow with which to finance a reorganization effort is considered a factor in granting relief from stay for cause.  In re MacInnis, 235 B.R. 255

(Bankr. S.D. N.Y. 1998); see generally In re 234-6 West 22nd St. Corp, 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) (finding that factors indicating cause included that the debtor held one asset, the property was in foreclosure, the dispute was essentially between two parties, the timing evidenced an intent to delay the secured creditor, the debtor had little or no cash flow, the debtor had no employees, and the debtor could not meet its current expenses).

In this case, as discussed above, foreclosure proceedings have already been commenced due to the borrower's inability to service its debt. Debtor has no money.

Accordingly, Wells Fargo requests that this Court find that "cause" exists to terminate the automatic stay.

### B.  Relief from Stay Due to a Lack of Adequate Protection

Section 362(d)(1) further requires relief from the automatic stay when "the debtor is not providing adequate protection to the creditor's interest in the property." In re Nattchase Assocs. Ltd. P'ship, 178 B.R. 409, 416 (Bankr. E.D. Va. 1994). In one case, the court granted the secured creditor relief from the automatic stay under § 362(d)(1) upon finding that the debtor's failure to make monthly payments under the loan for over one year, coupled with a small or nonexistent equity cushion, was a basis for finding lack of adequate protection and constituted 'cause.' In re James River Assoc., 148 B.R. 790 (Bankr. E.D. Va. 1992).

In this case, Debtor – which is not Wells Fargo's borrower – obviously has not made a payment to Wells Fargo. In fact, Wells Fargo has not received a single payment on its Loan since the borrower's default in August of 2008. With respect to an equity cushion, Wells Fargo's equity cushion is approximately 25%. This is insufficient to provide adequate protection. See, e.g., Matter of Lake Tahoe Land Co., Inc., 5 B.R. 34 (Bankr. Nev. 1980) ("adequate protection, for a lender as opposed to a seller, for land, even raw land partly developed by roads, sewer and water, is a leverage of 40% to 50% of the market value").

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

Wells Fargo is not receiving a penny of the revenues generated by the Property, which are presumably being pocketed by Nationwide.  Thus, the balance of the Loan continues to accrue interest and fees while no payments are made to service the debt on the Property.  See In re McPherson, 225 B.R. 203 (Bankr. D. Idaho 1998) (junior mortgagee was entitled to relief from stay where any potential equity that the debtor had in the property would be eaten up by costs of foreclosure sale, and by the post-petition interest and attorney fees that continued to accrue to senior mortgagee's claim in its capacity as over-secured creditor, and that, given the lack of any equity cushion, the court could not conclude that the junior mortgagee's rights were adequately protected).

Moreover, "[a] secured creditor lacks adequate protection if there is a threat that the value of the property may decline…the failure to provide for real property taxes may also be a basis for a finding of lack of adequate protection."  In re Pinto, 191 B.R. 610, 612 (Bankr. D.N.J. 1996).  Thus, "courts have deemed a mortgagor's failure to pay real estate taxes…'cause' for lifting the stay for lack of adequate protection."  Matter of 183 Lorraine Street Assocs., 198 B.R. 16, 23 (E.D.N.Y. 1996), citing In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994), and In re Jamesway Corp., 179 B.R. 33, 35 (S.D.N.Y. 1995).  See also James River Assoc., 148 B.R. at 796 ("[t]he failure to pay real property taxes may constitute a basis for finding lack of adequate protection").  As stated by one bankruptcy judge, "…I know of no rule of law which insists that a Debtor continue as the beneficiary of the stay of foreclosure when there is no corresponding payment made to at least keep interest or taxes current."  In re Washington Funding Corp. 13 B.R. 216, 223 (Bankr. S.D.N.Y. 1975); see also In re Brown, 78 B.R. 449, 503 (Bankr. S.D. Ohio 1987).

In this case, the Property is accruing a significant amount of tax arrearage, which has resulted in tax liens on the Property.  The economy still appears to be in a state of decline, such

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

27

1    that the value of the Property will likely continue to depreciate.

2         Wells Fargo is not adequately protected.

3    **C.    Relief From Stay Pursuant to §362(d)(2)**

4         Relief from the automatic stay is proper where the "[d]ebtor does not have any equity

5    in such property" and "such property is not necessary to an effective reorganization."    11

6    U.S.C. § 362(d)(2)(A)-(B).  While the burden is on the creditor to prove lack of equity in the

7    property, the Debtor has the burden of proof on all remaining issues.  See United Sav. Ass'n v.

8    Timbers, 484 U.S. 365, 375-76 (1988), ("[o]nce the movant under § 362(d)(2) establishes that

9    he is an undersecured creditor, it is the burden of the debtor to establish that the collateral at

10   issue is necessary to an effective reorganization"); see also In re Sun Valley Ranches, Inc., 823

11   F.2d 1373, 1375 (9th Cir. 1987); In re Bialac, 712 F.2d 426 (9th Cir. 1983) (burden of proof on

12   question of debtor's lack of equity in property, for purposes of determining whether automatic

13

14   stay should be lifted, lies with the creditor).

15

16         **1.    No Equity Exists in the Real Property**

17         "Equity" is referred to as the difference between the value of the property and all

18   encumbrances upon it.  In re Indian Palms Assoc., Ltd., B.C., 61 F.3d 197 (3rd Cir. 1995);

19   Stewart v. Gurley, 745 F.2d 1194, 1195 (9th Cir. 1984).  All encumbrances are totaled to

20   determine equity, regardless of whether all lien-holders have requested relief from the stay.

21

22   See Indian Palms, 61 F.3d at 206.

23         Here, as indicated in the schedules herein, as well as the relevant proofs of claim filed

24   in the Nationwide Case, the Property is encumbered as follows:

25

26

27

28

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

| El Dorado County | Priority | $120,304.91 |
| City of South Lake Tahoe | Priority | $67,290.82 |
| Wells Fargo | Secured | $1,858,480.08 |
| Resource Capital | Secured | $950,000.00 |
| Don Braham | Secured | $1,050,000.00 |
| Barclay Financial Group | Secured | $564,332.50 |
| **TOTAL** | | **$4,610,408.31** |

Thus, the total amount of the encumbrances against the Property is in excess of $4.6 million.  The Appraisal commissioned by Wells Fargo values the Property at $2,720,000 as of August 19, 2009, and the decline in the real estate market has not yet come to a halt.[15]  In the meantime, Debtor has not made any pre- or post-petition payments on any of the secured or priority loans, the balances of which continue to accrue interest and fees thereby increasing the amount of the encumbrances on the Property.

Accordingly, Debtor is wholly without equity in the Property.

### 2.    The Property is Not Necessary to an Effective Reorganization

Under § 362(d), a debtor must demonstrate that the property for which relief from stay is being sought is necessary for an effective reorganization. The Supreme Court provided further guidance in this area when it noted that there must be "a reasonable possibility of a successful reorganization within a reasonable time." Timbers, 484 U.S. at 626.

This is a chapter 11 proceeding in which foreclosure proceedings have already been commenced.  Debtor has no money, and no operations.  These facts indicate that Debtor lacks the ability to reorganize at *all*.  This case is similar to In re H-Ren, Corp., 65 B.R. 661 (Bankr.

---

[15] Debtor's valuation of $10,675,000 is simply not credible.  It is contradicted by Debtor's own valuation of its members' proportionate interests in the Property, and by the fact that none of the buyers that the TICs have presented to Wells Fargo have ever been interested in purchasing Wells Fargo's $1.8 million Note at a discount.  No appraisal valuing the Property (alone) has ever been presented by the TICs in any of the three bankruptcy cases.  Finally, even if the $10,675,000 value had any basis in reality when it was asserted in the Nationwide Case in January of this year: (a) it is highly unlikely that that value would have remained unchanged over the 7 months since that time; and (b) Nationwide purported to value the Property as part of a greater assemblage – which Debtor does not.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

S.D. Ohio 1986). There, the court granted relief from stay as to an approximate 2,300 acre parcel of unimproved real property on which the Debtor owed approximately $823,000 and had no equity. Where the Debtor could demonstrate no connection between the unimproved parcel and any ongoing or reasonably contemplated business, and it was clear that the sale of the property would not generate funds to be contributed to a reorganization, relief from stay was granted pursuant to 11 U.S.C. § 362.

In this case, Debtor's prospects for reorganization are made even more unlikely by the still-pending bankruptcy of the Property's manager, Nationwide. Even if Debtor owns the majority interest in the Property – which Wells Fargo doubts – Nationwide apparently remains the manager of the Property, and has neither accepted nor rejected the executory contract that purports to grant it that status.[16] Moreover, according to the TIC Agreement, a unanimous vote of all of the TICs – including Alan Pollack and Nationwide – is required in order to: (1) engage a [different] manager; (2) sell the Property; (3) execute any lease on the Property; or (4) further encumber the Property. Thus, any attempt at reorganization that involves anything other than the transfer or sale of Debtor's *interest* in the Property would require coordinating with two other bankruptcy estates across multiple state lines.

Reorganization appears *particularly* bleak for this Debtor in light of the fact that: (1) the TICs were unable to market, sell or refinance the Property during the year that has lapsed since the default on Wells Fargo's Loan, notwithstanding significant incentive to do so, and (2) Mr. Cliff Strand testified in open court in the Nationwide Case that Nationwide would not be

---

[16] Debtor's counsel has advised of his belief that a majority of the TICs is sufficient to terminate the manager, and has indicated that the Debtor may do so. However: (1) § 5.13 of the Tenants-in-Common Agreement provides that upon termination, "the Co-Owners *shall* appoint a successor Manager" – which requires a unanimous vote, including Nationwide's own vote; and (2) given that Nationwide remains in bankruptcy, it is unlikely that Debtor will be able to terminate this executory contract which has not yet been assumed or rejected.

SHEA & CARLYON, LTD.
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

filing a plan of reorganization.  Nationwide, as the manager and operator of the Blue Lake Inn located on the Property had a far greater chance at reorganization than Debtor, who is at best simply a passive owner of the Property.  It is therefore submitted that Debtor will be unable to demonstrate a likelihood of a successful reorganization within a reasonable period of time.

As there is no reasonable probability of Debtor's successful reorganization, the second element of § 362(d)(2) has been satisfied, and the automatic stay should be lifted.

**D.    A Determination that the Nature of Debtor's Business is that of a Single Asset Real Estate**

Section 362(d)(3) provides that the Court shall grant relief from the automatic stay under certain circumstances "with respect to a stay of an act against single asset real estate". However, the court must first determine "that the debtor is subject to this paragraph."

Wells Fargo's claim is secured by an interest in the Property, which constitutes a single asset real estate, defined by 11 U.S.C. § 101(51B) as:

> real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental…

There is no question but that the Property consists of a single project – the Blue Lake Inn – which generates all of the gross income of Debtor, whose sole business is that of owning the Property and receiving distributions of the revenues therefrom.

On its Chapter 11 petition, Debtor declined to select "Single Asset Real Estate" as its choice for the "Nature of Business."  While this choice is not surprising in light of the concerted efforts of Debtor's principals to thwart Wells Fargo's foreclosure, it does require Wells Fargo to seek this Court's determination as to Debtor's single asset real estate status.

Accordingly, Wells Fargo requests that the Court find nature of Debtor's business to be

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

31

1    that of a single asset real estate, and to grant Wells Fargo relief from the automatic stay

2    pursuant to 11 U.S.C. §362(d)(3).

3              E.    **Relief From Stay Pursuant to §362(d)(4)**

4              Section 362(d)(4) provides, in part, that the Court shall grant relief from the automatic

5    stay:

6         with respect to a stay of an act against real property under subsection (a), by a
          creditor whose claim is secured by an interest in such real property, if the court
7         finds that the filing of the petition was part of a scheme to delay, hinder, and
          defraud creditors that involved either-
8
          (A) transfer of all or part ownership of, or other interest in, such real property
9         without the consent of the secured creditor or court approval; or

10        (B) multiple bankruptcy filings affecting such real property

11             "It is not common to have direct evidence of an artful plot or plan to deceive others. In

12   general, the court must infer the existence and contents of a scheme from circumstantial

13   evidence."  In re Duncan & Forbes Development, Inc., 368 B.R. 27, 32 (Bankr. C.D. Cal.

14   2006).  "The party claiming such a scheme must present evidence sufficient for the trier of fact

15   to infer the existence and content of the scheme."  Id.

16

17             In Duncan, although the court ultimately determined that the evidence submitted was

18   insufficient to establish a "scheme to delay, hinder, and defraud creditors",[17] the court noted

19   that the transfer of property from an individual to a related corporation while a foreclosure is in

20   progress is…suspicious," that "[t]he filing of a bankruptcy case soon after a transfer of

21   property, which is its only asset, to that corporation adds a second level of suspicion to the

22   transaction."  Id. at 33.

23

24   _____

25   [17] Although in Duncan the court held that the conjunctive in "delay, hinder, *and* defraud" was deliberate, and that
     each of those three purposes needs to be present in order to find a scheme warranting relief from stay under §
26   362(d)(4), Wells Fargo submits that such grammatical precision is not generally regarded as characteristic of the
     Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  See, e.g., In re Trejos, 352 B.R. 249, 253-
27   54 (Bankr. D. Nev. 2006).

28

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

All of these facts are present in this case, as well as having been present in the Nationwide Case. In addition to the facts present in <u>Duncan</u>, however, this case contains many more indicia that the filings and representations by the TICs in the three bankruptcy cases are in furtherance of a scheme calculated to further hinder, delay and defraud Wells Fargo. The parade of actions that the TICs have taken throughout these bankruptcy proceedings are discussed at length in the Fasani Declaration, which provides an abundance of evidence that, not only has Mr. Strand been directing a scheme to hinder, delay and defraud *Wells Fargo*, but he has been scheming to defraud even the TICs that have entrusted him with their investment.

"Notably…§ 362(d)(4)(A) does not require that it be the *debtor* who has created the scheme or carried it out, or even that the debtor be a party to the scheme at all." <u>Duncan</u>, 368 B.R. at 32. Thus, where "the debtor's chief executive officer who owned the property at issue himself until four days before this bankruptcy filing, was the party who conducted the scheme, [i]f he engaged in a scheme as described in § 362(d)(4)(A), this is a sufficient basis for granting relief from stay thereunder." <u>Id.</u>

It is evident from Mr. Strand's manipulations that the delay that he has caused Wells Fargo and his other creditors was deliberate and intentional, out of "malice, fraud, covin, collusion or guile." <u>Id.</u>

"A scheme to defraud creditors, in the fraudulent transfer context, means a scheme to avoid paying them." <u>Id.</u> As <u>Duncan</u> acknowledged, "[b]ecause intent to defraud is not commonly admitted, courts frequently must rely on circumstantial evidence of intent to defraud." <u>Id.</u> Moreover, common sense requires that, just because a scheme is unlikely to ultimately succeed, either because it is difficult or because it is not cleverly designed, does not make it any less of a fraudulent scheme. Thus, for example, in the case of a secured creditor that holds a deed of trust on a piece of property, it would be exceedingly difficult to devise a

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

33

scheme wherein that creditor actually would not get paid at all, since our system of laws and recording statutes provide a certain level of protection for such a lien. Were this to be the standard to which schemes under § 362(d)(4) are held, it is unlikely that any secured creditor could *ever* demonstrate a scheme sufficient to warrant relief from stay.

Indeed, with respect to this Property, each of Nationwide, the Strands, and now Debtor have actually and repeatedly asserted that Wells Fargo should not be permitted to foreclose upon its security due to spurious allegations that Wells Fargo is not the real party in interest. This scheme to avoid paying Wells Fargo does not appear to have been in any way intimidated by the substantial evidence to the contrary and the rulings of two separate bankruptcy courts that have expressly found Wells Fargo to be the real party in interest. Wells Fargo has been forced to fight to obtain relief from stay in no less than (now) three separate bankruptcy courts. Under these circumstances, this very possibly presents the ultimate test as to whether there is any meaning and effect to § 362(d)(4) at all. If, notwithstanding the patent evidence of the scheming of Cliff Strand and other TICs throughout three separate bankruptcy cases, there is still determined to be insufficient evidence of a scheme to hinder, delay and defraud, Wells Fargo submits that there will *never* be such a case.

Relief under this section is critical. Wells Fargo understands that there are at least two other TICs that have not yet subjected the Property to the automatic stay, including William Biddle as the trustee of the William S. Biddle Family Trust, and Julieann Dull. Each of those TICs filed a declaration in the Nationwide Case supporting Nationwide's efforts to stall Wells Fargo's foreclosure. See Nationwide Case, Docket Nos. 77 and 79. Wells Fargo has little doubt that, as Cliff Strand was able to exercise his influence to gain their support in the Nationwide Case, these TICs will be prominent in at least a *fourth* bankruptcy filing – unless the Court grants Wells Fargo *in rem* relief.

*SHEA & CARLYON, LTD.*
701 Bridger Ave., Suite 850
Las Vegas, Nevada 89101
(702) 471-7432

34

1    Wells Fargo should be permitted to complete is long-overdue foreclosure on the

2    Property without any further delay.  Due to the dilatory and fraudulent manipulations of Cliff

3    Strand and his cohorts, Wells Fargo will almost certainly require an order granting it *in rem*

4    relief from the automatic stay in order to do so.  Accordingly, Wells Fargo requests relief from

5    the automatic stay pursuant to 11 U.S.C. § 362(d)(4).

6

7    **III.**

8    **CONCLUSION**

9    For the reasons stated above, Wells Fargo requests an order: (1) granting relief from the

10   automatic stay pursuant to § 362(d)(1) to permit Wells Fargo to conclude its foreclosure on the

11   Property; (2) granting in rem relief from the automatic stay to prevent future bankruptcy filings

12   from tying up the Property; (3) determining the nature of Debtor's business to be a single asset

13   real estate; and (4) waiving the 10-day stay that would otherwise be imposed pursuant to Fed.

14   R. Bankr. P. 4001(a)(3).

15

16   DATED this 30th day of September, 2009.

17                                                            SHEA & CARLYON, LTD.

18

19

20                                                            SHLOMO S. SHERMAN, ESQ.
                                                             Nevada Bar No. 009688
21                                                           701 E. Bridger Avenue, Suite 850
                                                             Las Vegas, NV 89101
22

23                                                           *Counsel for Wells Fargo Bank, N.A.*

24

25

26

27

28

* * **§362 INFORMATION SHEET** * *

| | | |
|---|---|---|
| **Tahoe Friday, LLC** | **09-52910-GWZ** | _____ |
| DEBTOR | BANKRUPTCY NO. | MOTION NO. |
| | | |
| Wells Fargo Bank, N.A._____ | CHAPTER  11 | |
| MOVANT | | |

---

**Certification of Attempt to Resolve the Matter Without Court Action:**

Moving counsel hereby certified that pursuant to the requirements of LR 4001(a)(5), an attempt has been made to resolve the matter without court action, but movant has been unable to do so.

Date: 9/30/2009                    Signature: _____

                                                        Attorney for Movant

---

PROPERTY INVOLVED IN THIS MOTION: real property known as 944 Friday Avenue and 939 LaSalle Street, South Tahoe, California 96150, and assigned Assessor Parcel Nos. 029-053-08 and 029-053-13

NOTICE SERVED ON:  Debtor(s) ___X___;  Debtor(s) counsel __X___; Trustee ____X_____

DATE OF SERVICE:  September 30, 2009 _____

---

| MOVING PARTY'S CONTENTIONS: | DEBTOR'S CONTENTIONS: |
|---|---|
| The EXTENT and PRIORITY OF LIENS: | The EXTENT and PRIORITY OF LIENS: |
| 1st : $1,858,480.08 | 1st _____ |
| 2nd: $950,000.00 | 2nd _____ |
| 3rd: $1,050,000.00 | 3rd _____ |
| 4th : $564,332.50 | 4th _____ |
| Other: Unpaid Taxes $187,595.73 | Other _____ |
| Total Encumbrances: $4,610,408.31 | Total Encumbrances: _____ |
| | |
| APPRAISAL or OPINION as to VALUE: | APPRAISAL or OPINION as to VALUE: |
| **$2,720,000.00** | |

| TERMS of MOVANT'S CONTRACT with the DEBTOR(S): | OFFER OF "ADEQUATE PROTECTION" for MOVANT: |
|---|---|
| Amount of Note: **$1,855,000.00** | |
| Interest Rate: **6%** | |
| Duration: **24 year, 4 months** | |
| Payment per Month: **$15,692.30** | |
| Date of Default: **August 7, 2008** | |
| Amount of Arrears: **$1,858,480.08** | |
| Date of Notice of Default: **October 8, 2008** | |
| | |
| SPECIAL CIRCUMSTANCES: | SPECIAL CIRCUMSTANCES: |
| **"New Debtor Syndrome"; three bankruptcies with two prepetition transfers of interests in property to prevent foreclosure** | |
| | |
| SUBMITTED BY: Shlomo S. Sherman, Esq. | SUBMITTED BY: _____ |
| | |
| SIGNATURE: _____ | SIGNATURE: _____ |

"EXHIBIT A"